## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**CHRIS FIERRO,**

        **Plaintiff,**

**vs.**                                  **Civ. No.  06-410 JH/WDS**

**MESA VERDE ENTERPRISES, INC.,**
**and CAL McNATT,**

        **Defendants.**

## MEMORANDUM OPINION AND ORDER

This matter came before the Court on *Defendants' Motion for Summary Judgment and Memorandum in Support* [Doc. No. 38], as well as *Plaintiff's Motion to Strike Sham Defense Argument Or, Alternatively, Request to Respond/Surreply* [Doc. No. 51].  The motions present two issues.  First, the Court must determine whether Plaintiff has attempted to create sham issues of fact through corrections to his deposition testimony and through his affidavit, written in response to Defendants' motion for summary judgment.  Second, the Court must determine whether there is a genuine issue of material fact on each claim in Plaintiff's case.  After considering the law, the evidence, and the arguments of counsel, the Court concludes that the motion to strike should be denied, and that the motion for summary judgment should be granted in part and denied in part.

## LEGAL STANDARDS

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'"  *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted).  Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

To carry its initial burden, the moving party need not negate the nonmoving party's claim. *See Allen v. Muskogee, Okl.*, 119 F.3d 837, 840 (10th Cir. 1997), *cert. denied sub nom. Smith v. Allen*, 522 U.S. 1148 (1998).  "'Instead, the movant only bears the initial burden of 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  A plaintiff cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment but rather must produce some specific factual support of its claim.  *See Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988); *Fritzcshe v. Albuquerque Mun. Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Upon a motion for summary judgment, a court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).  If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law.  *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

2

In determining whether summary judgment is appropriate, a court should not disregard a party's evidence simply because it conflicts with his or her prior sworn statements; however, such evidence may be disregarded when a court concludes that the evidence is merely an attempt to create a sham fact issue. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) (disregarding an affidavit that is contrary to the affiant's earlier sworn statements and designed to create a sham issue of fact); *Burns v. Bd. of County Comm'rs of Jackson Cty.*, 330 F.3d 1275, 1282 (10th Cir. 2003) (extending *Franks* to deposition corrections that contradict the original testimony). "[T]he utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting [evidence] contradicting his own prior testimony." *Franks*, 796 F.2d at 1237. "Factors relevant to the existence of a sham fact issue include whether the [party] was cross-examined during his earlier testimony, whether the [party] had access to the pertinent evidence at the time of his earlier testimony or whether the [contested evidence] was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the [contested evidence] attempts to explain." *Id.*

In this case, the parties dispute the validity of Plaintiff's alterations to his deposition testimony on the errata page provided by the court reporter in accordance with Rule 30(e) of the Federal Rules of Civil Procedure. They also dispute the extent to which Plaintiff's affidavit dated April 22, 2007—prepared after Defendants filed their motion for summary judgment—contradicts or supplements his deposition testimony, and the question of whether it is a sham affidavit. With regard to the changes Plaintiff made to his deposition testimony via errata, the Court finds guidance in the Tenth Circuit's opinion in *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n. 5 (10th Cir. 2002), in which the Court observed:

We are dismayed with [defendant's] reliance upon errata from deposition testimony

3

where that errata strayed substantively from the original testimony. . . .We do not condone counsel's allowing for material changes to deposition testimony and certainly do not approve of the use of such altered testimony that is controverted by the original testimony. *See, e.g., Coleman v. Southern Pac. Transp. Co.*, 997 F.Supp. 1197, 1205 (D. Ariz. 1998) (discrediting deposition testimony directly contradicted by errata sheet); *S.E.C. v. Parkersburg Wireless, L.L.C.*, 156 F.R.D. 529, 535 (D.D.C. 1994) (noting modern trend in which courts do not allow a party "to make any substantive change she so desires" in deposition testimony); *Rios v. Bigler*, 847 F.Supp. 1538, 1546-47 (D. Kan. 1994) (stating that the court will consider only those changes which clarify the deposition, and not those which materially alter it); *Greenway v. International Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992) (suppressing deponent's attempt to rewrite material answers given in deposition); *Barlow v. Esselte Pendaflex Corp*., 111 F.R.D. 404, 406 (M.D.N.C. 1986) (refusing to consider changes to deposition that were made in bad faith). Of all these courts, perhaps the *Greenway* court expressed the purpose and scope of Rule 30(e) best:

> The purpose of Rule 30(e) is obvious. Should the reporter make a substantive error, i.e., he reported "yes" but I said "no," or a formal error, i.e., he reported the name to be "Lawrence Smith" but the proper name is "Laurence Smith," then corrections by the deponent would be in order. *The Rule cannot be interpreted to allow one to alter what was said under oath.* If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.

*Greenway*, 144 F.R.D. at 325 (emphasis added).

The Court will address the issues raised in both motions in light of these authorities.

## FACTUAL BACKGROUND

Viewed in the light most favorable to Fierro, the facts as set forth in the evidence presented by parties are as follows. Defendant Mesa Verde Enterprises, Inc. ("Mesa Verde") hired Plaintiff Chris Fierro ("Fierro") in March of 1997. Fierro Depo. Vol. I at p. 4; Fierro Aff. at ¶ 1. At either the time of his interview, or shortly after he was hired, Mesa Verde provided Fierro with a set of company policies and procedures. Fierro Depo. Vol. II at p. 4; Plaintiff's Resp. Br. at p. 11. Those policies provide:

> PROBATIONARY PERIOD. A probationary period of six months for each employee will begin from the initial date of employment. During this time, the

> employee may be terminated without any written or verbal reprimands if it is deemed
> that his/her work performance is unsatisfactory as determined by the supervisor or
> management. . . .   GROUNDS FOR TERMINATION.   Prior to termination,
> employees will be given one verbal reprimand and one written reprimand.  If the
> problem persists, the employee will be terminated.  Based on the seriousness of the
> employee's action or violation, the verbal or written reprimand or both may be
> waived and termination can be immediate.

Defendants' Ex. 2.  Fierro signed a form indicating that he had read and understood these policies.

*See* Plaintiff's Ex. 4.  However, Fierro testified at his November 16, 2006 deposition that he did not

read the policies and procedures at that time or at any later time.  Fierro Depo. Vol. I at pp. 67-68.[1]

_____

[1] In his Affidavit Fierro contends that he did read and understand these original policies
and procedures, and in fact kept them because of their importance.  Fierro Aff. at ¶ 4. This is a
material change in his answer, not a correction of a substantive mistake by the court reporter or
the correction of a mere formal error, such as a change in the spelling of a name.  Rather, Fierro
has completely reversed his answer.  He explains this discrepancy in his testimony by stating
that at the deposition, he was confused about which policies and procedures Defendant's
attorney was referring to.  The Court finds this explanation unpersuasive.  Fierro's counsel was
present at his deposition and had the opportunity to cross-examine him to clarify any confusion
in his testimony.  At the time of the deposition, Fierro apparently had access to the policies at
issue, because later he produced them to the Defendants; thus, this was not newly discovered
evidence.  Finally, Fierro's deposition testimony regarding this issue reflects no confusion
regarding what is being asked of him:

> Q:  And that indicates that when you were hired on in March of '97, you were
> given a copy of whatever Policies and Procedures existed at that time; is that
> right?
> A:  That's correct.
> Q:  Did you review those at that time?  Do you know?
> A:  Probably not.
> Q:  Okay.  And why do you say "probably not"?
> A:  Because I was out of work.  I wanted to get to work.
> . . . .
> Q:  My question is, did you—even after you started working, did you ever read
> them?
> A:  No.
> Q:  Why not?
> A:  I just didn't read them.

Fierro Depo. at p. 68.  In light of the foregoing, and the reasoning of the Tenth Circuit's opinion
in *Garcia v. Pueblo Country Club*, the Court rejects the reversal in Fierro's testimony.  For

Mesa Verde revised its employment policies and procedures in 2001. Fierro signed a document acknowledging that he had read the revised policies and procedures, but he does not think that he ever received or read them. Fierro Depo. Vol. II at pp. 10-12. The 2001 policies contain the same language quoted above with regard to termination of employment. Plaintiff's Resp. Br. at ¶12. Mesa Verde revised its policies and procedures again in 2002, 2004, and 2005, but Fierro does not recall if he ever saw or read those revisions. Fierro Depo. Vol. I p. 57, Vol. II pp. 14-15, 20. The revised 2005 manual states that, "**THIS MANUAL IS NOT A CONTRACT OF EMPLOYMENT**," that employment is at will, and that "based on the seriousness of the employee's action or violation, the verbal or written reprimand or both may be waived and termination can be immediate." Defendants' Ex. 4 at pp. 2, 7.

In March of 2004, Mesa Verde hired Chester Connor ("Connor") as a shop/warehouse supervisor. At that time, Mesa Verde employed Fierro as a "tireman" under Connor's supervision. Connor Depo. at pp. 6-7; Fierro Depo. Vol. I at p. 12. Connor asked Fierro if he wanted to be Connor's "right hand man" in the shop. Plaintiff agreed, and Connor promoted him to shop foreman. Fierro Depo. Vol. I at pp. 12, 14-15. Mesa Verde compensated Fierro on an hourly basis as a tireman, and continued to do so after promoting him to shop foreman. Fierro Aff. at ¶ 7. However, in July of 2004, Mesa Verde changed Fierro's position to salary rather than hourly. *Id.* As he had as an hourly employee, Fierro continued to work approximately twenty hours of overtime per week while on salary, but he was no longer compensated for that extra time as he had been as an hourly employee. *Id.* Although he received two salary increases as shop foreman, Fierro's income had been higher when he was working as an hourly tireman. *Id.*

---

purposes of this motion and this particular issue, the Court will accept Fierro's original deposition testimony, and not the errata notes or his Affidavit.

As shop foreman, Fierro "ran the shop" and its nine or ten employees. Fierro Depo. Vol. I at p. 24, and he was in charge while Connor was away. *Id.* at p. 33. One of his duties as shop foreman was to tell those employees what they needed to do every day. *Id.* at pp. 16, 28-29. Fierro received requests from either the office or the field regarding needed equipment repairs. Fierro Aff. at ¶ 10. Either Fierro or Connor would make sure that the proper mechanic or shop employee handled the repair, based on that employee's skill and experience. *Id.*; Fierro Depo. Vol. I at pp. 28-29. However, Fierro did not have the authority to schedule the shop employees' work hours, authorize overtime, issue reprimands, or to grant them time off. Fierro Depo. Vol. I. at pp. 16, 18. Fierro participated in "a few" interviews of prospective employees for mechanics' helpers. *Id.* at p. 16.[2] He was asked to make a recommendation as to whether the person should be hired or not, and those recommendations were followed. *Id.* at pp. 17-18. Fierro also recommended two employees for promotions when asked about it by Connor. *Id.* at pp. 18-19. Connor also asked for Fierro's recommendation regarding firing one employee, *id.* at p. 20, but then ignored Fierro's recommendation that another employee be fired. Fierro Aff. at ¶ 18. Connor did not ask Fierro for advice on employee discipline issues. Fierro Depo. Vol. I at p. 23. Fierro signed off on employee time cards occasionally in Connor's absence. *Id.* at p. 32. In addition, Fierro ordered small parts for the shop, although he had to get permission from others to order more expensive ones. *Id.* at pp. 25-26. As shop foreman, Fierro continued his duties as a tireman, handling all tire changes on Mesa Verde vehicles and doing oil changes. Fierro Aff. at ¶ 12. A few months after he became foreman, Mesa Verde hired another employee to assist Fierro with these duties. *Id.*

---

[2] The record contains no evidence as to whether Fierro participated in all such interviews during the relevant time period, or only a portion of them. The same is true of promotions and terminations of employees—the record contains no evidence

In June of 2005, Lance Anderson ("Anderson") applied for a position with Mesa Verde. Anderson listed Fierro as a reference. As it turns out, Anderson was dating Fierro's teenage daughter, who was pregnant with Anderson's child. Fierro Aff. at ¶ 20. Fierro disclosed this familial relationship to Connor, the individual making the hiring decision. *Id.*; Fierro Depo. Vol. I at p. 140-41. The two discussed whether Fierro could work with Anderson in a professional manner, as well as Fierro's desire to keep his daughter's pregnancy quiet as long as possible. Fierro Aff. at ¶ 20. Later, Susie Davis ("Davis") and Connor interviewed Anderson. *Id.* at ¶ 21. Davis called Fierro into that interview and asked how he knew Anderson. *Id.* Fierro told Davis truthfully about his prior work experience with Anderson but did not reveal the familial relationship. *Id.*; Fierro Depo. Vol. I at p. 139. At that time, Connor did not disclose to Davis that he know about Anderson's relationship to Fierro's daughter. *Id.* A few days later, Connor gave Fierro a verbal warning, saying that Fierro should have disclosed the relationship with Anderson to Davis. *Id.* at ¶ 24; Fierro Depo. Vol. I at p. 142.

On August 10, 2005, an incident occurred in the warehouse near the shop. Fierro was passing through to retrieve a manual or tool, when an employee named Garrett McNatt greeted Fierro saying, "How's it going, Chris?" Fierro Depo. Vol. I at pp. 82-83. Another employee, Christy Huffman ("Huffmon"), responded that "he just got back from your mama's house, he should be doing fine" or words to that effect. Garrett McNatt said, "fuck you, bitch" and walked away. Jackson Depo. at p. 46-58, 51-52. Fierro asked the other employees what had happened but did not report the incident to anyone. Fierro Depo. Vol. I at p. 99; Fierro Aff. at ¶ ¶ 26-27. Mesa Verde placed Connor in charge of investigating the incident. He spoke to all witnesses, including Fierro, and no one disputed this version of events. Connor Depo. at pp. 48, 50. However, the parties dispute whether Fierro represented to Connor that he had actually heard Huffmon's words to Garrett

McNatt.  Fierro contends that he asked the other employees what happened and took their word for it, but never actually heard Huffman's words or represented to Connor that he had heard her.  Fierro Aff. at ¶ ¶ 26-27, 29, 33; Fierro Depo. Vol. I at pp. 106-08.  Mesa Verde contends that Fierro acknowledged to Connor that Huffmon said those words.  Connor Depo. at p. 50.  In any event, Mesa Verde terminated Huffmon's employment due to her role in the incident.  *Id.* at p. 56.

A few days later Davis asked Connor to obtain written statements from witnesses regarding the August 10, 2005 incident so that the file would be complete.  Connor Depo. at p. 63.  Connor then obtained those statements from witness, explaining that the matter "might go to court."[3]  Fierro Depo. Vol. I at pp. 109, 112-13.  Fierro's written statement omitted the comment Huffmon made to McNatt.  Defendant's Ex. 7.  Because Connor maintains that earlier Fierro told him verbally about Huffmon's statement, Connor and Mesa Verde construe Fierro's written statement as a change in his story.  Connor Depo. at pp. 72-73; Fierro Aff. at ¶ 33.  On the other hand, Fierro claims that he did not hear Garrett McNatt ask him how it was going or Huffmon's remark in response, but only McNatt's profane remark to Huffmon.  Fierro Aff. at ¶ 27.  He claims that everyone agreed on the basic facts, that during the investigation Connor never asked him directly what he had personally observed, and that as a result he did not see the need to make it clear to Connor exactly which portion of the conversation he had actually witnessed until he was called to make a written statement.  *Id.* at ¶ ¶ 29, 32-33.

As a result of the foregoing, Connor recommended to Tim Rabon, President of Mesa Verde, and Cal McNatt, General Manager of Mesa Verde (and father of Garrett McNatt) that they terminate Fierro's employment.  Connor Depo. at pp. 77-78.  Though Mesa Verde contends that Tim Rabon,

---

[3] Although Fierro now argues that Connor told him that the matter would "likely" go to court, that version of events is not supported by Fierro's deposition testimony or his affidavit.

Jeff Rabon, Cal McNatt, Davis, and Connor all participated in the decision to terminate Fierro, *see* Rabon Depo. at pp. 12-15, 17; McNatt Depo. at pp. 81-82, Mesa Verde stated in its response to the New Mexico Human Rights Division's questionnaire that Cal McNatt was the final decisionmaker. Plaintiff's Ex. 14 at p. 2.  On August 18, 2005, Mesa Verde terminated Fierro's employment.  Mesa Verde's stated reasons were (1) Fierro's alleged failure to disclose the truth about the August 10, 2005 incident in his written statement, (2) Fierro's failure to fulfill his supervisory responsibility to take action immediately with regard to the August 10, 2005 incident, and (3) the June 2005 reprimand regarding Anderson.  Defendant's Ex. 10.

In the six days between Huffmon's termination and his own termination, Fierro never told any supervisor at Mesa Verde that he believed Huffmon's termination was not right because he does not believe there was time to say anything.  Fierro Depo. Vol. I at p. 132.   Fierro does not believe that Mesa Verde fired Huffmon because of her sex.[4]  *Id*. at p. 150.

On August 18, 2005, the day Mesa Verde fired Fierro, Huffmon contacted the New Mexico Human Rights Division about her charge of discrimination (though there is no evidence in the record that anyone at Mesa Verde was aware that she made contact with the NMHRD that day).  On August 25, 2005, Huffmon signed that charge and filed it soon thereafter.  On August 29, 2005, Fierro signed his own charge of discrimination and filed it shortly thereafter.

_____

[4] Fierro's deposition testimony on this point is unequivocal.  However, in Paragraph 37 of his Affidavit, Fierro takes the reverse position and claims that he misunderstood the question, and must have interpreted it incorrectly.  However, the deposition transcript reflects no confusion by Fierro.  Further, his counsel was present at the deposition and had the opportunity to clarify any alleged confusion on cross examination, but failed to do so.  Fierro does not claim that the court reporter erred in transcribing his response, but rather attempts to make a substantive change in his response after the fact.  Under *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n. 5 (10th Cir. 2002), the Court finds this unacceptable and will use Fierro's deposition testimony instead of his Affidavit with regard to this issue.

**DISCUSSION**

**I.      RETALIATION IN VIOLATION OF TITLE VII AND THE NMHRA (COUNT I)**

Fierro alleges that Mesa Verde retaliated against him for refusing to falsify his witness statement regarding the incident between Huffmon and Garrett McNatt which ultimately led to Huffmon's termination.  Both Title VII and the New Mexico Human Rights Act ("NMHRA") prohibit an employer from discriminating against an employee because that employee has opposed discrimination in the workplace. 42 U.S.C. § 2000e-3(a); NMSA 1978, § 28-1-1 et seq.  To make out a prima facie case of retaliation under either statute, a plaintiff must show that: (1) he engaged in protected activity; (2) the employer took an adverse employment action against him; and (3) there exists a causal connection between the protected activity and the adverse action. *Aquilino v. Univ. of Kan.*, 268 F.3d 930, 933 (10th Cir. 2001); *Ocana v. American Furniture Co.*, 2004-NMSC-018, ¶ 33, 135 N.M. 539.   In this case, Defendants contend that they are entitled to summary judgment because Fierro has failed to come forward with evidence that he engaged in a protected activity; for purposes of this motion, they do not dispute the second and third elements of the retaliation claim.

Both Title VII and the NMHRA prohibit an employer from discriminating against any employee who opposes any unlawful employment practice or who participates in any manner in a proceeding under the statute.  *See* 42 U.S.C. § 2000e-3(a) and NMSA 1978, § 28-1-7(l)(2) (2007). Defendants argue that Fierro has failed to demonstrate protected activity through either opposition or participation.  In light of the fact that he admits that he did not speak out against Huffmon's termination, and the fact that his response brief contains no arguments regarding alleged opposition, Fierro apparently concedes the fact that he did not engage in any conduct in opposition to unlawful discrimination.  However, he argues that he did participate in protected activity.  Thus, the question before the Court is whether Fierro's conduct in providing a written statement in response to Mesa

11

Verde's request constitutes "participation" under Title VII and the NMHRA. That question is particularly narrow here, where it is undisputed that neither Huffmon nor Fierro had initiated any formal proceeding under either Title VII or the NMHRA at the time Fierro gave his written statement.

The Tenth Circuit's opinion in *Sauers v. Salt Lake County*, 1 F.3d 1122 (10th Cir. 1993) provides some guidance. In that case, the plaintiff alleged that her supervisor took an adverse employment action against her because he feared that she would bring a sexual harassment claim against him in the future. *Id.* at 1127-28. At trial, plaintiff introduced tape-recorded evidence that the supervisor feared that "someone" would file a sexual harassment charge against him. *Id.* at 1128. The court found that this was sufficient to make out a prima facie case of retaliation, stating:

> Plaintiff had not yet taken any action against which [the supervisor] could retaliate, but the tape-recorded conversation [] indicates his fear that a sexual harassment complaint might soon be filed by plaintiff. Action taken against an individual in anticipation of that person engaging in protected opposition to discrimination is no less retaliatory than action taken after the fact; consequently, we hold that this form of preemptive retaliation falls within the scope of 42 U.S.C. § 2000e-3(a).

*Id. See also Jeffries v. Kansas*, 147 F.3d 1220, 1231 n.9 (10th Cir. 1998) ("[W]e see no reason why a complaint to management must necessarily be 'formal' in order to trigger the prohibition against retaliation."), *superceded on other grounds by Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

Similarly, in this case Plaintiff has presented evidence from which the jury could conclude that Mesa Verde believed that Huffmon's termination of employment "might go to court." Though disputed, there is evidence in the record that Connor made that statement to Fierro, and that Mesa Verde asked the witnesses to the Huffmon-McNatt encounter to also comment on possible racial comments made in Huffmon's presence. From this evidence, a jury could conclude that Mesa Verde

solicited written witness statements in anticipation of such proceedings, and that, in light of the

content of Fierro's written statement, it anticipated that his testimony in any such proceeding would

be adverse to Mesa Verde's interests.  While the evidence is not overwhelming, in light of *Sauers*

the Court concludes that, at this stage, Fierro has come forward with enough to withstand Mesa

Verde's motion for summary judgment, which will be denied.

## II.    COMMON LAW RETALIATORY DISCHARGE (COUNT II)[5]

In Count II of his Amended Complaint, Fierro alleges that Mesa Verde unlawfully

discharged him for performing an act in furtherance of New Mexico public policy—making a

truthful statement in connection with an employer's internal investigation of alleged employee

misconduct.

The New Mexico law governing the tort of retaliatory discharge, also known as wrongful

discharge or retaliatory discharge, is well developed.  New Mexico has allowed employees to

recover in tort when their discharge contravenes a "clear mandate of public policy." *Vigil v. Arzola*,

102 N.M. 682, 688, 699 P.2d 613, 619 (Ct. App. 1983), *rev'd in part on other grounds by* 101 N.M.

687, 687 P.2d 1038 (1984), *overruled in part on other grounds by Chavez v. Manville Prods. Corp.*,

108 N.M. 643, 777 P.2d 371 (1989).  The basic burden on the employee in such a case is to prove

that he was discharged because she performed an act that public policy has authorized or would

encourage or that she refused to perform an act that public policy would condemn.  *Id.* at 689, 699

P.2d at 620.  Later New Mexico cases have clarified the elements of the cause of action to require

---

[5] When an employment contract protects an employee from wrongful discharge, that employee may not avail himself of the tort of retaliatory discharge.  *See Silva v. American Fed. of State, Cty., and Mun. Employees*, 2001-NMSC-038 at ¶ 12, 131 N.M. 364. Because he has pled a claim for breach of contract, the Court assumes that Fierro pleads that claim and his claim for retaliatory discharge in the alternative.

the employee to prove that his actions were not "merely private or proprietary," but rather were undertaken to "further the public good." *Gutierrez v. Sundancer Indian Jewelry, Inc*., 117 N.M. 41, 48, 868 P.2d 1266, 1273 (Ct. App. 1993) (citation omitted). *See also Garrity v. Overland Sheepskin Co. of Taos*, 1996-NMSC-032, ¶¶ 15- 16, 121 N.M. 710.  In addition, the employee must prove that the employer was aware of his protected acts and discharged him, at least in part, because of that conduct. *Weidler v. Big J Enters., Inc.*, 1998-NMCA-021, ¶¶ 25, 34-35, 124 N.M. 591; *Lihosit v. I & W, Inc*., 121 N.M. 455, 458, 913 P.2d 262, 265 (Ct. App. 1996).

Mesa Verde contends that it is entitled to summary judgment on this claim because Fierro was not fired for doing any act in furtherance of public policy.  The Court agrees with Mesa Verde that New Mexico's perjury statute, NMSA 1978, § 30-25-1, is not a source of public policy with regard to this claim.  The written statement that Fierro provided to Connor in the course of the Mesa Verde's internal investigation of the Huffmon-McNatt incident was not under oath or affirmation, and therefore did not subject him to a charge of perjury.  This statute simply does not apply.

However, the Court finds that both New Mexico and federal law set forth a clear public policy in favor of ending employment discrimination based on sex, race, color, disability, etc.  *See, e.g.*, New Mexico Human Rights Act, NMSA 1978, § 28-1-1 et seq.;  Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  Both New Mexico and federal law also contain a public policy in favor of requiring employers to not only prevent, but also to actively investigate and halt, any such unlawful discrimination.  *See, e.g., Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1270 (10th Cir. 2005); *Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir. 1995) ("[I]naction [cannot] fairly be said to qualify as a remedy 'reasonably calculated to end the harassment.' Title VII does not permit employers to stand idly by once they learn that sexual harassment has occurred. To do so amounts to ratification of the prior harassment." (citation omitted)).  Employers can fulfill

14

this legal duty only if they conduct thorough internal investigations in which employees are able to

come forward with truthful witness statement without fear of reprisal from the employer.

In *Gutierrez v. Sundancer Indian Jewelry, Inc.*, 117 N.M. 41, 47, 868 P.2d 1266, 1272(Ct.

App. 1993), the New Mexico Court of Appeals considered the claim of an employee discharged for

reporting unsafe working conditions to the appropriate public agency.  The Court concluded that

such whistleblowing to a public agency furthers the public interest in a safe workplace and would

serve as the basis for a retaliatory-discharge suit.  *Id*.  *Gutierrez*, however, did not address the case

of an employee reporting information only to his or her supervisor.  In *Garrity v. Overland

Sheepskin Co. of Taos*, 121 N.M. 710, 716, 917 P.2d 1382, 1388 (1996), the New Mexico Supreme

Court held that *Gutierrez* should not be read as foreclosing the possibility of bringing a

retaliatory-discharge claim in such circumstances.  Rather, the *Garrity* court emphasized the

statement in *Gutierrez* that "Whether an employee has stated a sufficient policy to recover for the

tort of wrongful discharge is determined on a case-by-case basis."  117 N.M. at 47, 868 P.2d at

1272.  As *Gutierrez* explained:

> [T]here is a tension between the obvious societal benefits in having employees with
> access to information expose activities which may be illegal or which may jeopardize
> health and safety, and accepted concepts of employee loyalty; nevertheless we
> conclude that on balance actions which enhance the enforcement of our laws or
> expose unsafe conditions, or otherwise serve some singularly public purpose, will
> inure to the benefit of the public.

*Id*. at 48, 868 P.2d at 1273 (citation omitted).  Accordingly, when evaluating a retaliatory-discharge

claim in which an employee has asserted a clear mandate of public policy but did not alert the

appropriate public officials, the court must determine on a case-by-case basis whether the

employee's actions furthered some singularly public purpose or served primarily to benefit the

private interest of the employer or employee.  *Garrity*, 121 N.M. at 717, 917 P.2d at 1389.

The New Mexico common law tort of wrongful discharge encourages right conduct in both employers and employees.  If an employer can act with impunity in retaliation for an employee's truthful statement during the course of an internal investigation before an outside report is made, the employer has no incentive to attempt to correct the problem internally where it exists.  As a general proposition, the law should encourage addressing and resolving employment discrimination issues at the most basic level possible.  Thus, this Court concludes that making a truthful statement regarding an alleged discriminatory act during the course of an employer's internal investigation is an act that public policy would encourage.[6]

In addition, the Court cannot conclude that statements given during an internal investigation of alleged discrimination or harassment can be deemed to serve only an employee's private interest, regardless of whether a formal charge of discrimination or harassment has actually been filed. The real life effect of participating in an internal inquiry—and thus its legal import—depends on the surrounding circumstances in each case. Given the variability of the work place, it is impossible and improper to say that such participation can only implicate private interests. To the contrary, dependence on context for meaning argues strongly for leaving the issue to the jury for determination in the first instance.   In this case, the Court finds that there is enough evidence for the jury on this claim.  Mesa Verde's motion for summary judgment will be denied.

**III.    BREACH OF EXPRESS AND IMPLIED CONTRACT (COUNT V)**

In Count V of his First Amended Complaint, Fierro alleges that he had both an express and an implied contract of employment with Mesa Verde that limited its ability to discharge him at will. In New Mexico, an employment relationship is "at will" and either the employer or the employee

---

[6] The Court expresses no opinion as to whether Fierro's written statement to Connor was in fact truthful; that matter lies within the province of the jury.

16

may terminate the relationship absent an express contract to the contrary.  *See Gormley v. Coca-Cola Enters.*, 2004-NMCA-021 ¶ 20, 135 N.M. 128, 134 (citing *Lopez v. Kline*, 124 N.M. 539, 953 P.2d 304 (1997)). Exceptions to the general rule, however, exist when there is an express or implied contract limiting the employer's authority to discharge, or the employer engages in retaliatory discharge in violation of public policy.  *See id.*; *Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 668, 857 P.2d 776, 779 (1993)).  An implied contract may be found (i) in written or oral representation; (ii) in the parties' conduct; or (iii) in a combination of representations and conduct. *See Gormley*, 135 N.M. at 134-35, 85 P.3d at 258-59 (citing *Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 427-28, 773 P.2d 1231, 1234-35 (1989)).  In *Gormley v. Coca-Cola Enterprises*, the Court of Appeals held that, whether an implied contract exists is a question of fact, based on the totality of the circumstances, including the employer's oral, explicit, and definite representation. *See* 108 N.M. at 134-35, 85 P.3d at 258-259 (citing *Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 669, 857 P.2d 776, 780 (1993); *Garrity v. Overland Sheepskin Co.*, 121 N.M. 710, 917 P.2d 1382 (1996)).

The existence of contract involves a determination of whether an employee's expectations regarding the terms of her employment are reasonable.  *See Hartbarger*, 115 N.M. at 672 ("An employer does not have to issue a policy statement limiting its power to discharge, but if the employer chooses to do so and creates a reasonable expectation on the part of the employee, it is bound to fulfill that expectation.").  This, in turn, depends in large measure upon whether promises or offers made by the employer were sufficiently explicit to give rise to the reasonable expectations by the employee.  *Id.*  ("In examining implied employment contract cases, we always have required that the *promise* that is claimed to have altered the presumed at-will term *be sufficiently explicit* to give rise to reasonable expectations of termination for good cause only.") (emphasis in original).

17

A representation in an employee handbook or personnel policies may contractually modify the at-will presumption. *Hartbarger*, 115 N.M. at 669, 857 P.2d at 780; *Newberry*, 108 N.M. at 426-27, 773 P.2d at 1233-34. To create contractual rights, however, the terms of the representation must be sufficiently explicit to create a reasonable expectation of an implied contract. *Garrity*, 1996-NMSC-032, ¶ 12, 121 N.M. 710.

In this case, the Court has relied upon Fierro's deposition testimony in which he stated that he never read Mesa Verde's policies and procedures. This fact alone prevents the formation of an implied contract, because if Fierro never read the policies, then he could not have had a reasonable expectation of continued employment based on those policies.[7]  In addition, it is undisputed that Mesa Verde (through Connor) gave Fierro a verbal reprimand for his failure to disclose his relationship with Anderson to Davis, and that it terminated Fierro after the Huffmon incident without first giving him a written reprimand.  Fierro contends that this action by Mesa Verde constituted a failure to comply with the contract it created in its policies on termination.  However, the policy on which Fierro relies expressly states that Mesa Verde may bypass the reprimands and proceed directly to termination: "Based on the seriousness of the employee's action or violation, the verbal or written reprimand or both may be waived and termination can be immediate." Defendants' Ex. 2.  This provision is fairly vague; it does not set forth with any specificity what may constitute a sufficiently serious violation to justify immediate termination, which implies that it is left to the

---

[7] Neither party explicitly addresses the question of whether Fierro's failure to read the policies (despite signing a form indicating that he had read and understood them, *see* Plaintiff's Ex. 4) prevented the initial formation of a valid *express* contract with Mesa Verde.  However, as further discussed herein, given the vagueness of the 1997 policy, as well as the 2005 modifications, the Court concludes that Fierro's employment was at will and Mesa Verde breached no contract with him.  As a result, the Court need  not reach the question of the effect of Fierro's failure to read the policies on the formation of an express contract.

18

discretion of the employer.  Such latitude for Mesa Verde weighs against Fierro's claim for the existence of either an express or implied contract.

The fact that Mesa Verde further modified its policies in July of 2005 (approximately one month before terminating Fierro) further undermines Fierro's breach of contract claim.  The modified policy states that it is not a contract of employment, expressly provides for employment at will, and advises that either the employee or Mesa Verde may terminate the employment relationship at any time, with or without cause.  Defendant's Ex. 4 at pp. 3, 8.  Fierro argues that Mesa Verde had no right to unilaterally modify the alleged contract terms in this manner and that those modifications are invalid because they are not supported by mutual assent and consideration. However, as Mesa Verde correctly points out, New Mexico law requires no mutual assent or consideration for contracts implied from employment policies; rather, those elements are implied by the employee's commencement or continuation of work under the altered provisions.  *See Hartbarger v. Frank Paxton Lumber Co.*, 115 N.M. 665, 669-72, 857 P.2d 776, 780-83 (1993). Therefore, the Court concludes that Mesa Verde did not violate either an express or an implied contract with Fierro by terminating his employment in August of 2005.

## IV.  INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS BY DEFENDANT McNATT (COUNT III)

Fierro claims that Defendant McNatt has not only tortiously interfered with his employment contract with Mesa Verde, but has also engaged in a conspiracy with others to do so.  As an initial matter, Defendants point out that Fierro has come forward with no evidence to demonstrate the presence of a conspiracy to interfere with his employment contract.  Fierro does not dispute this argument or point to any evidence of a conspiracy.  Therefore, the Court will grant Defendants' motion for summary judgment on the conspiracy claim, leaving only Fierro's tortious interference

claim against Cal McNatt in his individual capacity.

Generally speaking, in order to prevail on a claim for tortious interference with existing contractual relations, a plaintiff must prove that (1) the defendant had "knowledge of the contract" between plaintiff and another party, (2) performance of the contract was refused, (3) defendant "played an active and substantial part in causing the plaintiff to lose the benefits of his contract," (4) damages flowed from the breached contract, and (5) defendant induced the breach "without justification or privilege to do so." *Ettenson v. Burke*, 2001-NMCA-003 ¶ 14, 130 N.M. 67 (quoting *Wolf v. Perry*, 65 N.M. 457, 461-62, 339 P.2d 679, 681-82 (1959)). Not every interference leading to a breach of contract amounts to an unlawful act or a civil action; tort liability attaches only when the interference is without "justification or privilege." *Williams v. Ashcraft*, 72 N.M. 120, 121, 381 P.2d 55, 56 (1963).

On the other hand, the elements of a claim for interference with prospective contractual relations are slightly different.  In *Fikes v. Furst*, 2003-NMSC-033, 134 N.M. 602, the New Mexico Supreme Court stated that in order to establish this tort, a plaintiff must prove that the defendant's *sole* motive was to harm the plaintiff.  *Id*. at 609.  *See also Silverman v. Progressive Broadcasting, Inc.*, 1998-NMCA-107, ¶ 28, 125 N.M. 500, 964 P.2d 61 (stating that a claim for prospective interference with contract requires a showing that the sole motive was to harm the plaintiff).

A corporate officer, such as Defendant Cal McNatt, may be individually liable for interfering with a corporate contract if he acted outside the scope of his authority.  *Ettenson v. Burke*, 2001-NMCA-003, ¶¶ 16-17, 130 N.M. 67, 17 P.3d 440.  The majority view is "that a corporate officer is privileged to interfere with his corporation's contracts only when he acts in good faith and in the best interests of the corporation, as opposed to his own private interests."  *Id*. ¶ 17.  The fact

that the contract in question is terminable at will does not appear to alter the analysis.[8]  In *Kelly v. St. Vincent Hosp.*, 102 N.M. 201, 207, 692 P.2d 1350, 1356 (Ct. App. 1984), the New Mexico Court of Appeals discussed the application of the tort to existing contracts that are terminable at will.  The *Kelly* court observed that "[a]n interest in a contract terminable at will is primarily an interest in future relations between the parties when the party has no legal assurance of the relation. For that reason, interference with these contracts is closely analogous to interference with prospective contracts."  *Id.*   Thereafter, the Court of Appeals applied  *M & M Rental Tools, Inc. v. Milchem, Inc.*, 94 N.M. 449, 612 P.2d 241 (Ct. App. 1980), which held that tortious interference can be accomplished by two means: by improper motive solely to harm the plaintiff, or by improper means.  Here, Fierro argues that Cal McNatt acted with improper motive.[9]

After viewing all the evidence in the light most favorable to Fierro, the Court concludes that there exists an issue of fact as to Cal McNatt's motivation for terminating Fierro's employment, and specifically whether McNatt acted with the sole motive to harm Fierro.  Fierro has come forward with evidence that vulgar exchanges such as that between Garrett McNatt and Huffmon on August 10, 2005 had taken place at Mesa Verde and elicited no particular response from management or discipline of employees involved in such incidents.  Jackson Depo. at pp. 27-32; Darren Davis Depo. at p. 33; Nissley Depo. at pp. 19-22, 57-58.  One former Mesa Verde employee made several sexually harassing statements to another, and was admonished several times, before Mesa Verde

---

[8] Defendants agree with this point.  *See* Doc. No. 38 at p. 16.

[9] At the Call of the Calendar and pretrial conference held on August 9, 2007, both parties agreed that, in spite of the Court's decision finding that Mesa Verde's employment manuals and policies did not create an express or implied contract, Fierro's claim for tortious interference with contract could survive if he is able to demonstrate that Cal McNatt acted with the sole motive to harm Fierro.

fired him.  Harris Depo. at pp. 47-48.  It is undisputed that Cal McNatt is the father of Garrett McNatt.  Pete Nissley testified that Cal McNatt was visibly upset when he described Huffmon's remark to McNatt's son.  Nissley Depo. at pp. 48-49.  Although Mesa Verde knew on August 10, 2005 that Fierro did not intervene in the situation between Garrett McNatt and Huffmon, it did not terminate Fierro's employment immediately, but rather waited eight days until after Fierro gave a written statement that recorded Garrett McNatt's improper remark but not Huffmon's provocative statement.  On the other hand, the Defendants have come forward with evidence to show that Cal McNatt terminated Fierro because of the he believed that Fierro had been dishonest with Mesa Verde on two occasions and because as shop foreman, Fierro had a duty to intervene during the exchange between Huffmon and Garrett McNatt.  In other words, the facts surrounding Fierro's statement, including the question of whether he changed his story or made a misrepresentation to Connor, are disputed.  It will be up to the jury to determine whom to believe.  However, the Court finds that there is enough evidence for a jury to conclude that Cal McNatt extended special protection to his son, Garrett McNatt, and that he terminated Fierro for failing to provide a written statement that would support Cal McNatt's decision to fire Huffmon for her remark to his son, even though such remarks allegedly were commonplace at Mesa Verde.

Defendants argue that the claim against Cal McNatt must fail because it was a group of Mesa Verde managers, not Cal McNatt alone, who made the decision to fire Fierro.  Indeed, there is evidence in the record to support that conclusion.  However, this argument ignores the fact that the evidence on this point is disputed.  Mesa Verde's own letter to the New Mexico Human Rights Division during its administrative investigation of Fierro's claim states that Cal McNatt made the final decision to terminate Fierro.  Plaintiff's Ex. 14 at p. 2.  It is not the province of the Court to weigh the evidence or make credibility determinations at this juncture, and the existence of these

disputed material facts dictates the denial of Cal McNatt's motion for summary judgment on this claim.

## V.    VIOLATION OF THE FLSA AND NEW MEXICO OVERTIME WAGE LAWS (COUNT IV)

In Count IV of his Amended Complaint, Fierro alleges a claim for violation of overtime wage laws, asserting that in July 2004 Mesa Verde improperly placed him in a salaried position in an effort to deny him overtime pay.  He claims that while his job duties and the number of hours he worked did not change, and that he did not have any supervisory or management authority, Mesa Verde improperly classified him as an exempt employee and denied him overtime pay.  Fierro brings these claims under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and the New Mexico Minimum Wage Act ("MWA"), NMSA 1978, § 50-4-21 et seq.

### A.    FLSA

The issue before the Court is whether Fierro was an "exempt executive employee" under the FLSA such that Mesa Verde was justified in its failure to pay him overtime between July of 2004 and his termination in August of 2005.  That question, in turn, depends upon whether Fierro qualifies as an exempt executive employee under 29 C.F.R. § 541.100.[10]  That regulation states:

> the term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the [FLSA] shall mean any employee:
> (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more other employees; and

---

[10] The parties agree that the Court should apply the regulations as amended in 2004, even though they took effect a few weeks after Mesa Verde classified Fierro as exempt.

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

The employer, Mesa Verde, carries the burden of establishing that its employee qualifies for the exemption. *Sanders v. Elephant Butte Irr. Dist. of N.M.*, 112 F.3d 468, 470 (10th Cir. 1997). Further, exemptions are "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).

In this case, Fierro contends that Mesa Verde cannot demonstrate that his employment from July of 2004 until August of 2005 satisfied the second and fourth prongs of this test. With regard to the second prong, Fierro argues that the shop for which he was foreman is not a "customarily recognized department or subdivision" of Mesa Verde. In support of this position, he points to the testimony of Cal McNatt, who stated that the shop is part of the warehouse/maintenance department supervised by Connor. Mesa Verde responds that while it is not a formal department of Mesa Verde, the shop is a recognized subdivision of the company because it is a "unit with permanent status and function." *See* 29 C.F.R. § 541.103(a). The Court agrees with Mesa Verde. There is abundant evidence in the record from which one may infer that the shop is not a "mere collection of employees assigned from time to time to a specific job or series of jobs," but rather has a permanent status and a continuing function. *Id.* There is no evidence to the contrary.

Next, Fierro argues that there is no evidence to support the "management" aspect of the second prong of the test. The Court disagrees. As shop foreman, Fierro "ran the shop" and its nine or ten employees. Fierro Depo. Vol. I at p. 24, and he was in charge while Connor was away. *Id.* at p. 33. One of his duties as shop foreman was to tell those employees what they needed to do

every day. *Id*. at p. 16, 28-29. In that regard, Fierro received requests from either the office or the field regarding needed equipment repairs. Fierro Aff. at ¶ 10. Either Fierro or Connor would make sure that the proper mechanic or shop employee handled the repair, based on that employee's skill and experience. *Id*.; Fierro Depo. Vol. I at pp. 28-29. Fierro signed off on employee time cards occasionally in Connor's absence. *Id*. at p. 32. In addition, Fierro ordered small parts for the shop, although he had to get permission from others to order more expensive ones. Fierro Depo. Vol. I at pp. 25-26. On the other hand, there is evidence to the contrary. Fierro did not have the authority to schedule the shop employees' work hours, authorize overtime, issue reprimands, or to grant them time off. Fierro Depo. Vol. I. at pp. 16, 18. Further, the evidence shows that Fierro continued to spend a significant amount of time on non-managerial functions. As shop foreman, Fierro continued his duties as a tireman, handling all tire changes on Mesa Verde vehicles and doing oil changes. Fierro Aff. at ¶ 12. However, a few months after he became foreman, Mesa Verde hired another employee to assist Fierro with these duties. *Id*.

Next, Fierro disputes the fourth prong of the test for exemption—that is, Fierro contends that he did not have the authority to hire or fire other employees and that his suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were not given particular weight. The evidence on this point is mixed.[11] Some evidence supports the conclusion that Fierro did make such recommendations and that Mesa Verde gave his views some weight. For example, Fierro participated in "a few" interviews of prospective employees for mechanics' helpers. *Id*. at p. 16. He was asked to make a recommendation as to

---

[11] Mesa Verde contends that Fierro has contradicted his deposition testimony with a sham affidavit on these issues as well. The Court disagrees. Fierro's affidavit expands upon and explains his deposition testimony, which is not particularly thorough or detailed on this issue, but does not appear to directly contradict it.

whether the person should be hired or not, and those recommendations were followed. *Id.* at pp. 17-18.  However, Mesa Verde points to no evidence in the record regarding the weight it gave to Fierro's opinions, and therefore there is no way to know if his recommendations merely confirmed what Mesa Verde already wanted to do with respect to those employees, or if Mesa Verde actually relied on his insights in making employment decisions about shop employees.  Fierro also recommended two employees for promotions when specifically asked about them by Connor.  *Id.* at pp. 18-19.  Connor also asked for Fierro's recommendation regarding firing one employee, *id.* at p. 20, although he disregarded Fierro's advice when he said that another employee should be terminated.  Fierro Aff. at ¶ 18.  Again, Mesa Verde points to no evidence in the record regarding the weight that Fierro's opinions carried, or its own reliance upon his judgment.  In addition, Mesa Verde has come forward with no evidence as to whether Fierro participated in all interviews of prospective shop employees during the relevant time period, or only a portion of them.  The same is true of promotions and terminations of employees—the record contains no evidence as to whether Connor asked for Fierro's input on all of those events, or just on some occasions. Furthermore, the evidence in the record is that Connor did not ask Fierro for advice on employee discipline issues. *Id.* at p. 23.

After reviewing the evidence presented, the Court concludes that genuine issues of material fact exist on Mesa Verde's "executive employee" affirmative defense, and therefore its motion for summary judgment on that issue should be denied.

   **B.**   **MWA**

New Mexico's Minimum Wage Act applies only to "employees," which does not include "any individual employed in a bona fide executive, administrative or professional capacity and forepersons, superintendents and supervisors."  NMSA 1978, § 50-4-21(C)(2).  Defendants contend

that Fierro was exempt under this provision of the MWA because he was employed as "foreman" of the shop.  The regulations interpreting this provision that were in effect in 2005 provide:

> C. "Exempt" means an employee who is exempt from minimum wage or overtime provisions.  In order for an employee to be exempt under the executive category, the worker must meet all of the following requirements:
> (1) primary duty - perform nonmanual work related to management of business;
> (2) exercise discretion;
> (3) regularly assist executive, or perform specialized work, special assignments;
> (4) perform less than 20 percent nonexempt work.

N.M. Admin. Code § 11.1.4.7(C) (2005).

Fierro argues that under this regulation, he is not exempt from the MWA because he spent more than twenty percent of him time performing non-managerial tasks.  In his Affidavit, Fierro contends that the only job duty that changed after his title was changed from "tireman" to "shop foreman" was that Mesa Verde required him to review and prepare work orders, and then distribute those assignments to shop employees, Fierro Aff. at ¶ 13, and that this work accounted for only one third of his day. *Id.*  Fierro contends that his primary job functions were still changing tires and oil, lube jobs, ordering parts, and generally assisting mechanics with manual labor.  *Id.*  Because this is enough to create a genuine issue of material fact on the question of whether Fierro was an exempt employee under the MWA, and because it is not enough to have merely changed his job title to "foreman," the Court will deny Mesa Verde's motion for summary judgment on this claim as well.

**IT IS THEREFORE ORDERED** that:

(1)    *Plaintiff's Motion to Strike Sham Defense Argument Or, Alternatively, Request to Respond/Surreply* [Doc. No. 51] is **DENIED**, and Defendants' request for attorney's fees incurred in responding to the motion is also **DENIED**;

(2)    *Defendants' Motion for Summary Judgment and Memorandum in Support* [Doc. No. 38] is

**GRANTED IN PART AND DENIED IN PART**.  The motion for summary judgment is denied as to Plaintiff's claim for retaliation in violation of Title VII and the NMHRA (Count I), common law retaliatory discharge in violation of public policy (Count II), Plaintiff's claim against Cal McNatt for interference with contractual relations (Count III), and Plaintiff's claim for violation of the FLSA and the New Mexico MWA (Count IV).  The motion for summary judgment in granted as to Plaintiff's claim against Cal McNatt for civil conspiracy (Count III) and Plaintiff's claim for breach of express and implied contract (Count V).

_____
**UNITED STATES DISTRICT JUDGE**